No. 29,101.

Bessie A. McKenzie, *Appellant*, v. The Ruggles Construction Company, and The Board of County Commissioners of the County of Pratt, *Appellees*.

(284 Pac. 407.)

Opinion filed February 8, 1930.

*A. C. Malloy, Roy C. Davis, Warren H. White,* all of Hutchinson, and *E. R. Barnes,* of Pratt, for the appellant.

*Alfred Williams,* county attorney, *William Barrett, George Barrett,* both of Pratt, *W. A. Ayres, Austin M. Cowan, C. A. McCorkle, J. D. Fair* and *W. A. Kahrs,* all of Wichita, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action by the plaintiff, Bessie A. Mc-Kenzie, for the death of her husband, who was killed in an automobile accident while journeying between Hutchinson and Pratt one evening in April, 1927. The main road running east and west between these two cities is federal and state highway 54 and familiarly known as the Cannon-ball road. About four miles east of Pratt the highway coming from the east curved to the left and south, crossed the Ninnescah river, and then swung to the right until it regained the distance it had veered from the straight line. Thence it ran directly westward toward Pratt.

In May, 1926, the board of county commissioners of Pratt county determined to eliminate this curve in the road at the crossing of the Ninnescah, and to that end federal project No. 341A was planned, and a contract was let to the Ruggles Construction Company to build a new bridge across the river at a point directly in line with the highway to the east and west. They also let a contract to some other concern to make the approaching grades to the new bridge. These road improvements were nearly completed when the accident occurred with which we are presently concerned. The approaches had been brought to grade, and the bridge was virtually complete, lacking only the construction of guard rails and the removal of wheelborrows, cement mixer, and some tools and construction lumber which occupied part of the bridge floor. The bridge had not been accepted by the board of county commissioners, nor had the new road and bridge been opened for traffic, nor had the old road and bridge been closed for traffic.

On April 4, 1927, Charles McKenzie, Cecil Payne, Fred Love, John Hart and Jesse Williams, all barbers by profession, set out from Hutchinson in Payne's automobile to attend a barbers' lodge meeting at Pratt. They halted en route at Pretty Prairie and Kingman to invite barbers in those towns to join the barbers' association. With Payne at the wheel the car sped over the road at 30 to 35 miles per hour, past whatever signs there were to indicate the necessity for caution in driving and to indicate the curve in the road, past whatever warnings there were to show that the new bridge was not yet opened for travel, drove on to the bridge, striking some lumber piled thereabout, and plunged over the side of the bridge and into the river. McKenzie received injuries from which he died.

On the theory that the county board and the construction company were negligent, and that their negligence had caused McKenzie's death, Mrs. McKenzie brought this action, assuming that the new bridge and its approaches were part and parcel of the regular highway at the time of the accident, and that defendants had failed to install and keep a detour sign at the point where the road curved to the left, failed to indicate that the new bridge was not intended for use, failed to place and maintain red lights at the approach to the bridge, failed to maintain "barricades, boards, or signs" to warn travelers, "and negligently permitted timbers, concrete forms and materials to remain on the bridge, making it impossible for cars to pass thereon." Plaintiff concluded with a prayer for $10,000 in damages.

For answer the board of county commissioners admitted that it had let a contract to the Ruggles Construction Company to build the bridge, and that the latter was so engaged on April 4, 1927,—

"But such bridge on the 4th day of April, 1927, was not and never had been a part of any public highway and the construction of such bridge did not involve nor effect closing up of any existing road. . . .

"That . . . said bridge was intended eventually to become a part of public highway running east from the city of Pratt, known as the Cannonball road, and to take the place of the portion of the then existing highway of that name where the same approached and crossed the Ninnescah river at a different location; that the original road had never been closed nor changed in any way by the construction of said bridge and no detour of travel upon the road was had or necessitated by the construction of said bridge; and that at the date of April 4, 1927, alleged in plaintiff's petition, the said project No. 341A had not been opened for public travel and was not used for travel as a public highway, and the construction of the earth roadway under said project No. 341A had not been accepted by the county."

The answer of the county board also alleged that adequate signs at proper distances were maintained on the highway approaching the curve in the road to the left and leading to the established bridge across the Ninnescah—a sign of "curve" to the left, a "slow" sign, and near the point where the new grade projected from the point of the curve in the established road to the new bridge under construction there was a red reflector, and close to the east end of the bridge itself was a wooden barricade extending across the new grade which would prevent an automobile from going on the bridge unless it was knocked down or removed. The answer alleged that those signs and warnings were adequate and sufficient to relieve the county board from liability because of automobile accidents thereabout.

It was further alleged that the deceased and his fellows in the automobile were engaged in a joint enterprise at the time of the accident, and consequently the negligence of the driver was the negligence of all.

The answer of the Ruggles Construction Company was in accord with that of the county board. It denied that the bridge it was constructing was part of any public highway, alleged that in its contract to build the bridge it had not undertaken to construct the grades and approaches thereto, and that this grading had been awarded to another contractor, that the original road with the left curve and crossing of the Ninnescah had not been closed or changed by the work on the new bridge and approaches under project No. 341A. The defendant construction company further alleged that notwithstanding the construction work on project No. 341A did not close any existing road, yet adequate warning signs were maintained in the highway approaching the construction work on project No. 341A to warn the public, and that the accident occurred through no fault of defendant. It also alleged that McKenzie and the others in the automobile were engaged in a joint enterprise, that Payne, the driver, was negligent in leaving the highway and in coming upon the new grade and the unfinished and unopened bridge at high speed regardless of adequate signs and warnings, and that the negligence of Payne was attributable to all the occupants of the car.

On the issues thus joined the cause was tried before a jury. Plaintiff's evidence tended to show that the new grade and bridge were so nearly completed and so precisely in a direct line with the highway east and west of the curve leading to the left and across the old bridge that travelers on the highway would readily be misled into believing the new grade and bridge were in fact a part of the established highway. Plaintiff's evidence also tended to show that the signs were insufficient to warn travelers of the danger of attempting to cross the new bridge. The testimony of Payne, the driver, witness for plaintiff, candidly convicted himself of negligence. He testified:

"I was driving between thirty and thirty-five miles per hour at the time I approached this bridge. I remember seeing a 'slow' sign quite a ways from the bridge, and the next thing I saw was a red reflector. . . .

"The red reflector looked like a piece of glass standing up on a pole a little to the right of the road, and a pile of sand right up against it. . . . I cut the speed of the car down and saw the big pile of sand piled up against the light, and figured that the light was put there to keep me from running into the sand. . . . So I just turned on out around a little to the left and

started to speed up again, and the next thing I knew a lot of stuff loomed up out in front of me on this bridge, and I think I saw some kind of timber or big boards lying parallel with the bridge on the left-hand side, and that struck my wheel, and I went right down off the edge of the bridge, and down in the water, the car going upside down."

*"Cross-examination:*

"Before I got to this particular place, I noticed a sign that said 'slow.' That was quite a little ways from the bridge, probably three or four hundred feet, on the right side of the road. When I saw the sign, I slowed up a little, probably put on my brakes. *However, unless there is some occasion for it, I never slow up much for a slow sign,* unless it means something. The next thing I saw was the red flasher, I imagine I saw it about thirty feet away. . . .

"My lights were on dim. They cast a light for about thirty feet. I had a light that would have gone down the road for a block probably, but I was not using it. I was driving between thirty and thirty-five miles per hour. It was a dark night. . . .

"We had a meeting scheduled at Pratt at eight o'clock, and the accident happened about that time. . . . It was dark at the time of the accident. . . . I put on the brakes until I saw the pile of sand, and then took them off and started giving it the gas. I turned a little to the left and continued straight ahead until I hit this building material on the bridge. . . . When I saw that building material it bewildered me so to see that stuff piled up on a good-looking bridge that I probably didn't think of putting on my brakes again. I saw the 'slow' sign, but do not think there was any 'turn' sign. . . . There was a pile of bridge timbers about the center of the bridge. I don't remember seeing the cement mixer on the bridge, but remember seeing a wheelbarrow, nail kegs, some sand and building material. I could not swear that I tried to stop—I was so scared to see what I was coming into."

The testimony for defendants tended to establish the material allegations of their answer. Several witnesses, including some called by plaintiff, testified to the existence of the customary "slow" and "turn" signs at proper intervals before the left curve of the highway was reached. Some testified to the existence of a sign five feet high saying "Bridge under construction"; others testified to the existence of the barricade in plain sight at the east end of the unfinished bridge, and that a plank across the new grade three or four feet above the ground had been knocked to one side by the impact of the automobile. The testimony was that the red reflector showed plainly at 500 feet, and that such reflectors are used because they cannot be mistaken for the tail light of an automobile, and because they are no temptation for thieves to steal, and neither rain nor wind will put them out.

The jury returned a general verdict for defendants and answered certain special questions thus:

"No. 1. About how far did the headlights of the car light the road in front of the automobile?  A. Thirty feet or more.

"No. 2. Within what distance could the car be stopped going at the speed you find it was traveling?  A. Seventy-five to one hundred and twenty-five feet, depending on the way the car was handled.

"No. 3. About how far away could the red reflector in the center of the road be observed by cars approaching from the east?  A. One hundred to five hundred feet.

"No. 5. Did C. R. Payne fail to use ordinary care in operating his car? A. Yes.

"If you answer the above question in the affirmative, then was the failure of C. R. Payne to use ordinary care the proximate cause of the accident? A. Yes.

"No. 6. Did the plaintiff's husband, Charles McKenzie, now deceased, fail to use ordinary care for his own safety at the time in question, and thereby contribute proximately to produce his own death?  A. Yes, due to the fact that he was a party to a joint enterprise."

Judgment was rendered accordingly.  Plaintiff appeals.

The first complaint of the instructions relates to the so-called joint enterprise in which McKenzie and his associates were alleged to be engaged at the time of the accident and the legal effect attaching to each on account of the negligence of Payne, the driver. However, unless the negligence of the defendants or either of them was established, or unless the court erred in dealing with the alleged negligence of defendants, the legal questions involved in the joint enterprise will need no consideration.  The trial court's instructions made it clear that in the absence of negligence as alleged by plaintiff she could not recover against the defendants or either of them. Neither party complains of the adequacy of the instructions dealing with that primary phase of this case.  The general verdict acquits the defendants of negligence.  Moreover, the special findings, Nos. 1 to 5, show that it was not the defendants' fault, but the driver's, which caused the accident.  Whether the jury's finding No. 6, or whether the court's instructions dealing with the pertinent law of joint adventure were correct or not cannot affect the correctness of the judgment in favor of defendants, since both general and special verdicts acquit them of negligence.

Appellant assigns error in the exclusion of testimony, but she omitted to produce it in support of her motion for a new trial, so that point cannot be considered now.

She also complains of the admission of the testimony of the county engineer as to how the automobile struck the irons protruding up-

ward from the bridge floor and intended to be embedded in the cement sidewalks of the bridge. The objection to this testimony is that the county engineer was not an eyewitness to the accident and did not see the damage done to these irons by the automobile *until the next morning,* consequently he could not tell the jury how it happened. Apparently this testimony was given for what it might be worth to indicate the speed of the car as it bounded off the bridge, but on whatever theory it was offered its admission was not prejudicial.

Complaint is made because the appellant was not permitted to have the county engineer answer this question:

"Q. Do you know whether these signs are in use in any of the adjoining counties on contract work?"

[COUNSEL FOR DEFENDANTS]: "We object to that as immaterial and not proper cross-examination.

"BY THE COURT: Sustained."

Anent that matter plaintiff contends that the red reflector did not conform to the statute which requires the use of red lights after nightfall when a road is closed for repairs or construction work is going on which may imperil travelers on the highway. (R. S. 68-121.) But, as we have seen, this accident did not occur at a place on a public road which had been closed for repairs or construction work. It occurred at a place which had not yet become a part of the highway, so if technicalities are to be insisted upon they must be applied to both sides. Manifestly, however, both grounds of objection to the question were well taken, and the trial court's ruling was correct.

Complaint is made of the admission in evidence of whisky bottles picked up in the backwater near the overturned automobile, and of testimony of a doctor and nurse tending to show that Payne was intoxicated when he was having his wounds dressed at a hospital following the accident. The defendant construction company had pleaded in its answer that Payne was intoxicated, and the evidence was therefore competent on the issue involved in the joint adventure—if the action were not conclusively determinable on the complete absence of any negligence as charged against the defendants.

Error is assigned on the ruling of the court which struck from plaintiff's petition an allegation of negligence on the part of defendants because of their dilatoriness in prosecuting the construction

work. It is argued that if that work had been diligently prosecuted the new grade and bridge would have been completed and open for traffic long before the date of this accident. That charge of negligence was too remote. Manifestly it was not the proximate cause of the accident. But were the ruling erroneous it could avail the plaintiff naught in this appeal. The ruling was equivalent to sustaining a demurrer to that much of the petition; it involved the merits of the action; and since no appeal was taken therefrom within six months, it is not now reviewable. (*Norman v. Railway Co.*, 101 Kan. 678, 168 Pac. 830; *Schroyer v. Ruffhead*, 122 Kan. 767, 253 Pac. 414.)

There is no material error in the record and the judgment is affirmed.